[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14557

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2010
JOHN LEY
CLERK

D. C. Docket No. 04-00153-CR-J-34-HTS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLIFFORD ALLEN NEWMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 17, 2010)

Before DUBINA, Chief Judge, PRYOR and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

Clifford Allen Newman appeals his 33-month sentence imposed after

pleading guilty to one count of violating the International Parental Kidnapping

Crime Act ("IPKCA"), 18 U.S.C. § 1204. Mr. Newman argues that the district court erroneously enhanced his sentence under United States Sentencing Guidelines § 2J1.2(b)(2) and § 2J1.2(b)(3)(C). After review and oral argument, we affirm the district court's three-level enhancement under § 2J1.2(b)(2) because the offense resulted in "substantial interference with the administration of justice," but we conclude the district court clearly erred in finding that the offense was "otherwise extensive in scope, planning, or preparation." We therefore reverse and remand for resentencing consistent with this opinion.

## I.

Clifford and Monica Newman were married in 1992 and she later gave birth to a son. They divorced in 1996, and a Florida state court entered a decree awarding primary residential custody of their son, then three years old, to Mrs. Newman. Under the terms of the custody order, neither parent was permitted to remove the child from Florida without written, notarized consent of the other parent.

Shortly after the divorce decree was entered, Mr. Newman picked up his son for a scheduled visitation but never returned the child to his mother. Instead, he took the child to Yemen in violation of the state court's decree in an effort to avoid the court's custody determination. Mr. Newman abducted his son because, in his

words, he "could not just sit back and let [his] son be taken away," he "wanted to be his [son's] father and [he] wanted to raise him, and they wouldn't allow [him] to do that here," and contrary to the state court's decision, he "knew what was best for [his son]."

As a result of his actions, the Florida State Attorney's Office charged Mr. Newman with interference with custody in violation of Florida law and issued a state arrest warrant. The whereabouts of the father and child remained unknown, however, and he was never arrested or prosecuted on the state charges. Nearly eight years would pass before Mr. Newman and the boy were located. During this time, Mrs. Newman had no contact with her son.

In 2004, however, investigators got two breaks. First, authorities notified the U.S. State Department that Mr. Newman crossed an international border traveling on his United States passport. Second, Mr. Newman was arrested in Dubai in the United Arab Emirates for auto theft and attempted robbery. Through their investigation, federal law enforcement officers then learned that the child was living with Mr. Newman's second wife in Yemen. Shortly thereafter, Yemeni law enforcement officers working in concert with federal agents took custody of the child and a Yemeni court granted legal guardianship to the child's maternal grandmother. The grandmother then traveled with the child from Yemen to the

United States, where he was reunited with his mother at the age of eleven.

Following his arrest in Dubai, Mr. Newman was indicted in the Middle District of Florida and charged with one count of removing his child from, and retaining his child outside of, the United States in violation of the IPKCA. Upon his release from prison in Dubai five years later, Mr. Newman was returned to the United States and immediately arrested. He pleaded guilty to the indictment without a plea agreement.

The presentence report ("PSR") prepared by the United States Probation Office recommended that Mr. Newman's sentence be enhanced under two guidelines provisions. First, the PSR recommended a three-level increase under U.S.S.G. § 2J1.2(b)(2) because the offense resulted in "substantial interference with the administration of justice." Second, the PSR recommended a two-level enhancement under § 2J1.2(b)(3)(C) based on the probation officer's finding that the offense was "extensive in scope, planning, or preparation." With a criminal history category of III and a three-level decrease for acceptance of responsibility, Mr. Newman's guidelines range was 27 to 33 months.

Mr. Newman objected to both enhancements, but the district court overruled his objections. Specifically, the district court found the enhancement for substantial interference with the administration of justice applied based on Mr.

4

Newman's violation of the state court custody order. The district court also found that Mr. Newman's offense warranted an enhancement because it was extensive in scope, planning, or preparation, based on the eight-year duration of the offense and his flight to a country in the Middle East where it would be "extraordinarily difficult" to locate and return the child. After hearing from Mrs. Newman, argument from the parties, and Mr. Newman's allocution, the district court sentenced him to 33 months in prison. He now appeals.

## II.

"We review the district court's findings of fact for clear error and its application of the Sentencing Guidelines de novo." United States v. Lopez-Garcia, 565 F.3d 1306, 1323 (11th Cir. 2009). "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed." United States v. Rodriguez-Lopez, 363 F.3d 1134, 1137 (11th Cir. 2004) (internal quotation marks omitted).

## III.

Congress enacted the International Parental Kidnapping Crime Act in 1993 to "deter the removal of children from the United States to foreign countries in order to obstruct parental rights." See H.R. Rep. No. 103-390, at 1 (1993),

reprinted in 1993 U.S.C.C.A.N. 2419, 2419. The legislative history of the IPKCA

explains that the Act was intended as a response to issues left unaddressed by

international law:[1]

> There is an international civil mechanism relating to [cases of
> international parental kidnapping], the Hague Convention on
> International Parental Child Abduction, for which Congress passed
> implementing legislation in 1988. As a result of this convention, the
> signatories will recognize the custody decrees of other signatories,
> thereby facilitating the return of abducted children. However, most
> countries are not signatories to the Convention, thus leaving
> individual countries to take whatever legal unilateral action they can
> to obtain the return of abducted children.

Id. at 3, 1993 U.S.C.A.A.N. at 2421; see also United States v. Fazal-Ur-Raheman-

Fazal, 355 F.3d 40, 44 (1st Cir. 2004); United States v. Amer, 110 F.3d 873,

881–82 (2d Cir. 1997) (explaining that the IPKCA was passed to "close the gap"

left by the many countries that are not signatories to the Hague Convention and to

deter abductions to "safe haven" countries). In furtherance of that objective, the

IPKCA makes it a federal felony for a parent to remove a child from the United

---

[1] The Hague Convention on the Civil Aspects of International Child Abduction "is designed 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008) (quoting Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007)). When a child has been wrongfully removed from his country of habitual residence, the Convention through its implementing legislation, the International Child Abduction Remedies Act of 1988, 42 U.S.C. § 11603(b), "provides the non-abducting parent with a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." Id.

States, or to retain outside the United States a child who has been in the United States, with the intent to obstruct the other parent's lawful exercise of his or her parental rights. 18 U.S.C. § 1204(a).

Under the sentencing guidelines, violations of the IPKCA are assessed under U.S.S.G. § 2J1.2, which applies to obstruction of justice offenses. See U.S.S.G. app. A (statutory index). As explained above, the district court enhanced Mr. Newman's sentence by a total of five levels under § 2J1.2(b)(2) and § 2J1.2(b)(3)(C). Mr. Newman argues that application of both of these enhancements was error. Each is addressed in turn.

A.

Section 2J1.2(b)(2) provides for a three-level increase if "the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). The phrase "substantial interference with the administration of justice" "includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." Id. § 2J1.2 cmt. n.1. Because the term "'includes' is not exhaustive," id. § 1B1.1 cmt. n.2, the definition of "substantial interference with the administration of justice" in § 2J1.2 is not limited to the

7

examples set out in the guidelines. See United States v. Probel, 214 F.3d 1285, 1288 (11th Cir. 2000) (describing the nonexhaustive nature of the term "includes" in the context of U.S.S.G. § 2G2.2); Amer, 110 F.3d at 885 ("The term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement.").

The district court found that Mr. Newman's violation of the state court custody decree substantially interfered with the administration of justice, justifying the three-level enhancement. The district court believed that Mr. Newman's decision to abduct his child and secret him in the Middle East was motivated by his dissatisfaction with the state court's custody decision:

> Here, the defendant had the opportunity to participate in proper legal proceedings, to be heard, and to make his case. And then, dissatisfied with the outcome, rather than perhaps appeal it or otherwise contest it within the proper legal process, he chose to take the matter completely outside the proper administration of justice. And the Court is of the view that having done so, he did obstruct justice and he did substantially interfere with the administration of justice, that being, if nothing more, the orders of the State court with respect to the parental rights and the care of the child. And so for that reason the Court finds that the probation officer properly imposed the three-level enhancement for obstruction of justice under 2J1.[2].

Mr. Newman argues that his violation of the state custody decree cannot, by

itself, serve as the basis for this enhancement. According to Mr. Newman, the IPKCA requires an abduction intended to interfere with the other parent's legal rights, and when two parents are divorced, a custody decree is merely the legal mechanism by which those rights are established. Application of the enhancement in this context, Mr. Newman argues, would result in a per se rule that the enhancement applies in every § 1204(a) case where a custody order had been issued. And this, he contends, is contrary to the Sentencing Commission's intent that enhancements based on specific characteristics of the offense should apply only to "the more serious forms of obstruction." We do not agree.

This Court has no binding precedent setting forth what constitutes substantial interference with the administration of justice for purposes of applying the § 2J1.2(b)(2) enhancement. We conclude, however, that Mr. Newman's violation of the custody decree supports application of the enhancement in this case. The district court found that Mr. Newman was dissatisfied with the custody order and, rather than challenge it through lawful channels, he subverted the legal process and exercised a "self-help appeal" from state court's decision. The district court's findings in this regard were plainly supported by the record. Indeed, Mr. Newman admitted as much at the sentencing hearing. In our view, disregarding a lawful state court custody order and removing a child in direct violation of that

9

order—all with the intent to circumvent the state court's custody determination—constitutes substantial interference with the administration of justice within the meaning of § 2J1.2(b)(2).

Nor do we agree that our decision results in a per se rule that the enhancement applies in all § 1204(b) cases where a custody order has been issued. Contrary to Mr. Newman's argument, it is not the bare existence of the custody order that supports the enhancement in this case. Rather, it is the nexus between Mr. Newman's dissatisfaction with the lawful custody determination and his intent to frustrate and avoid the judicial process—not just the order itself—that renders § 2J1.2(b)(2) applicable. That being so, Mr. Newman's argument about blanket application of the § 2J1.2(b)(2) enhancement to divorced parents based on the mere existence of custody orders sweeps far too broadly.

Although there are surprisingly few reported decisions involving application of the § 2J1.2(b)(2) enhancement in parental kidnapping cases, our conclusion is supported by the Second Circuit's decision in United States v. Amer, 110 F.3d 873 (2d Cir. 1997). In that case, the defendant and his wife physically (though not legally) separated as a result of his abuse and the wife retained informal physical custody of their three children. Id. at 876. When, despite his threats to kill her, the defendant's wife refused to take the children to Egypt, the defendant abducted the

10

children and fled to Egypt just weeks before the mother obtained a custody order granting her legal guardianship. Id. at 876–77. The defendant, who eventually returned to the United States, was arrested and convicted by a jury of violating the IPKCA. Id. at 877. The district court enhanced his sentence under § 2J1.2(b)(2) based on its finding that, by abducting the children, the defendant "made certain that [a judicial proceeding] would never be commenced" and that by "deem[ing] himself the judge" he "made the decision" and "wholly ignored the lawful process, and acting in the form of a vigilante, . . . took matters into his own hands." Id. at 885. The Second Circuit affirmed, holding that the defendant's "'self-help' act of removing the children . . . could serve as a basis for this enhancement" because the defendant's actions "prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice." Id.

As in Amer, here Mr. Newman's actions were calculated to thwart the legal custody process and to ensure that he, and not a judge with jurisdiction over custody matters, would be the ultimate decisionmaker about who would retain custody of his child. The district court did not err in enhancing Mr. Newman's sentence under § 2J1.2(b)(2).[2]

---

[2] Because we conclude Mr. Newman's interference with the state court's decree is sufficient to support the enhancement, we need not reach the issue of whether the government's evidence regarding the expenditure of resources in locating and returning the child would be sufficient.

B.

Mr. Newman also challenges the district court's two-level enhancement under § 2J1.2(b)(3). Section 2J1.2(b)(3) provides for a two-level enhancement if "the offense . . . was otherwise extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3)(C). In applying this enhancement, the district court appears to have focused primarily on the eight-year duration of the offense. And though it is not entirely clear from the record, the district court may also have considered that Mr. Newman selected the Middle East as his destination because it would be "extraordinarily difficult" for authorities to locate and return the child. On the record before us, the district court's findings are clearly erroneous and must be reversed.

Mr. Newman is correct that, to the extent the district court found that he selected Yemen because it would be "extraordinarily difficult" to locate and return the child, that finding was unsupported by the record. The government did not present any evidence regarding either the difficulty of locating and returning a child from that country or Mr. Newman's intent to select it for that purpose. A district court's factual findings used to support a sentencing enhancement must be based on reliable and specific evidence and cannot be based on speculation. United States v. Cataldo, 171 F.3d 1316, 1321–22 (11th Cir. 1999) (explaining that

courts "'must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines'" (quoting United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993))). As Mr. Newman points out, the only competent evidence in the record indicates that he selected Yemen for religious and cultural reasons. The district court committed clear error to the extent it found that Mr. Newman brought his son to the Middle East because it would be difficult for anyone to find him there.

The district court's reliance on the eight-year duration of the offense to find that it was "extensive in scope" was also error. Although we have found no case directly on point, we hold that the duration of the offense is not equivalent to its "scope" for purposes of § 2J1.2(b)(3)(C). Both our case law and other provisions of the sentencing guidelines distinguish between the duration and scope of criminal offenses. For example, § 2B1.1, which applies to theft, fraud, and property offenses, directs the district court to "make a reasonable estimate of the loss" caused by the offense. U.S.S.G. § 2B1.1 cmt. n.3(C). In making this estimate, the guidelines instruct the district court to consider "available information . . . as appropriate and practicable under the circumstances" including "general factors, such as the scope and duration of the offense." Id. (emphasis added). The Commission's decision to include consideration of both the "scope" and "duration"

13

of the offense under § 2B1.1, while at the same time omitting any consideration of the "duration" of the offense from § 2J1.2(b)(3)(C), is significant. This is so because identical terms in different guidelines are generally presumed to have the same meaning in both provisions, and the disparate inclusion or exclusion of language is presumed to be intentional and purposeful. See United States v. Perez, 366 F.3d 1178, 1182–83 (11th Cir. 2004) (collecting cases). We therefore presume that the Commission said what it meant and meant what it said when it omitted the duration of the offense from consideration under § 2J1.2(b)(3)(C).

Our case law applying other provisions of the sentencing guidelines supports this interpretation. For example, in United States v. Holland, 22 F.3d 1040 (11th Cir. 1994), we interpreted U.S.S.G. § 3B1.1, which applies if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." See U.S.S.G. § 3B1.1(a). We held that in making the "otherwise extensive" determination, district courts should consider factors including both "the length and scope of the criminal activity." Holland, 22 F.3d at 1046 (emphasis added). Other circuits agree that the scope of the offense and its duration are separate factors to be considered. See, e.g., United States v. Arbour, 559 F.3d 50, 54 (1st Cir. 2009) (when determining whether a criminal activity is "otherwise extensive" courts should consider "the totality of the circumstances,

14

including not only the number of participants but also the . . . scope . . . and duration of the scheme" (quotations omitted)); United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995) (affirming a determination that a conspiracy was "otherwise extensive" based on the district court's finding that it was of "long duration" and of "national scope").

We have recognized a distinction between scope and duration in other contexts as well. In distinguishing between a Terry stop[3] and an arrest for Fourth Amendment purposes, for example, we assess the scope of the stop and its duration separately. See, e.g., United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) (explaining that to distinguish between a Terry stop and an arrest, we consider "'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention'" (quoting United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000))); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (differentiating between challenges to the duration of a traffic stop and challenges to the scope of such a stop).

Given the consistent distinction between the terms "scope" and "duration" in both the sentencing guidelines and our precedent, we conclude that the duration of

---

[3] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).

15

the offense cannot alone support a finding that it was "otherwise extensive in scope" under § 2J1.2(b)(3)(C). Therefore, to the extent the district court found that Mr. Newman's offense was "extensive in scope" based on its eight-year duration, the district court's finding was clearly erroneous.

## IV.

For these reasons, the district court's enhancement of Mr. Newman's sentence under § 2J1.2(b)(2) is affirmed. The district court's enhancement of Mr. Newman's sentence under § 2J1.2(b)(3)(C) is reversed and this case is remanded to the district court for resentencing consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.