[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11573

_____

D. C. Docket No. 8:16-cr-00484-SCB-TGW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOE HARRY PEGG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 29, 2020)

Before JILL PRYOR and GRANT, Circuit Judges, and ROYAL,[*] District Judge.

_____

[*]Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

PER CURIAM:

After Appellant Joe Harry Pegg began serving a 30-year sentence in federal prison, he aimed to reduce his sentence through a Rule 35 motion. To that end, Pegg paid a third-party cooperator to assist the government on his behalf, orchestrating the payments from prison through coded phone calls with his friends and family. Although such payments were not illegal, it was the policy of the United States Attorney's Office for the Middle District of Florida not to file a Rule 35 motion when a defendant had paid a cooperator. After the government discovered Pegg's scheme, Pegg lied during an interview with Assistant United States Attorneys and denied making any payments. As a result, the government indicted Pegg for conspiracy to obstruct justice, obstruction of justice, and making a false statement to federal law enforcement. After an eight-day trial, the jury found him guilty on all three counts, and the district court sentenced him to an additional 71 months. He now appeals his convictions and sentence.

On appeal, Pegg argues that the district court erred when it (1) denied his motion to suppress certain statements he made during an interview conducted without the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (2) refused to adopt three of Pegg's proposed jury instructions, (3) overruled his objections to the government's improper comments throughout trial and denied his motions for mistrial based on those comments, (4)

2

denied his motion for judgment of acquittal, (5) applied a three-level sentencing enhancement for interfering with the administration of justice, and (6) applied a two-level sentencing enhancement for an offense extensive in scope, planning, or preparation. After careful review and with the benefit of oral argument, we **AFFIRM**.

## I.    BACKGROUND

While Pegg was in prison serving a 30-year sentence for conspiracy to import marijuana,[1] Pegg's cellmate obtained a Rule 35 motion and a reduction of his sentence.[2] Seeing his cellmate's success, Pegg also wanted to reduce his sentence through Rule 35, and the two discussed the possibility of his cellmate acting as a third-party cooperator on Pegg's behalf after his cellmate's release. After Pegg's cellmate was released, however, his probation officer would not allow him to act as a third-party cooperator for Pegg. Thus, Pegg's cellmate enlisted Fernando Morales to serve as a third-party cooperator on Pegg's behalf in exchange for $60,000. Pegg eagerly agreed and hired Morales with Pegg's cellmate fostering all communication between Pegg and Morales.

---

[1] *See United States v. Pegg*, No. 94-38-cr-FtM-17(D) (M.D. Fla.).
[2] Rule 35 of the Federal Rules of Criminal Procedure sets forth the procedure by which a United States District Court, upon the government's motion, can reduce a defendant's sentence for providing substantial assistance to the government in the investigation or prosecution of another person. Fed. R. Crim. P. 35(b)(2).

Working undercover with DEA agents, Morales began setting up drug deals as a part of his third-party cooperation, but the deals kept falling apart. One promising target of the DEA investigation, Maikel Murais, became interested in buying cocaine from Morales. Murais, however, wanted to buy a small sample from Morales first, which violated DEA investigation policies and procedures. Murais refused to buy the drugs without a sample, and the agents stopped pursuing him. About four months later, to the agents' surprise, Morales informed the agents that Murais was ready to purchase cocaine from them. The agents met Murais for the drug deal, arrested him, and charged him with attempt to possess with intent to distribute cocaine.

After Pegg heard the good news about the arrest, he instructed his attorney to pressure the United States Attorney's Office for the Middle District of Florida (USAO) to file his Rule 35 motion. Pegg had also hired DEA agent Bob Quinn and former DEA agent Samuel Murad to ensure the Rule 35 effort ran smoothly from inside the DEA.[3] Agent Quinn set up a meeting with the USAO and Agent Gary Corbett, the DEA agent in charge of the Murais arrest, to ensure that Pegg would receive credit. Some concerns surfaced at the meeting based on Murais's sudden willingness to purchase drugs without sampling first, and Agent Corbett ultimately found evidence that Morales had, in fact, violated the DEA investigation policy and

---

[3] Quinn and Murad ultimately pleaded guilty for their role in the case.

4

provided Murais a sample of the cocaine. Although a grand jury indicted Murais, the USAO eventually abandoned the case because of Pegg and Morales's scheme.

Because Morales was a third-party cooperator for Pegg, the investigators also became suspicious of Pegg. Agent Corbett listened to Pegg's telephone calls from jail and found that Pegg had paid Morales $60,000 for his third-party cooperation, orchestrating the payments through coded phone calls to friends and family. Because Pegg paid Morales for third-party cooperation, USAO policy dictated that it would not file a Rule 35 motion to reduce his sentence.

Agent Corbett informed the USAO of his finding, and the USAO requested an interview with Pegg through his attorney. Pegg gladly consented, fully expecting that the interview would concern the Rule 35 motion the Assistant United States Attorneys (AUSA) would file on his behalf. Pegg, his attorney, AUSA Steven Muldrow, AUSA Anita Cream, and FBI Agent Lynn Billings, who posed as a paralegal, were present at the interview. With his attorney beside him, Pegg voluntarily answered questions concerning the third-party cooperation, but he ultimately lied about paying for it. The government later indicted Pegg and several co-conspirators.

After an eight-day trial, a jury convicted Pegg of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (count one); obstruction of justice, in violation of 18 U.S.C. § 1503 (count two); and making false and fraudulent

5

statements to a federal law enforcement officer, in violation of 18 U.S.C. § 1001(a)(2) (count three). The district court sentenced Pegg to serve 71 months on count two, to run concurrent with 60-month sentences on counts one and three. Pegg challenges his convictions and sentence in this appeal, arguing that the district court erred in denying his motion to suppress, denying his motions for mistrial, rejecting his proposed jury instructions, denying his motions for judgment of acquittal, and applying two sentencing enhancements.

## II.    DISCUSSION

### a.  Motion to Suppress

The district court denied Pegg's motions to suppress the statements he made during the interview based on Pegg's arguments that the interview violated his *Miranda* rights*,* finding Pegg was not in custody for purposes of *Miranda.* Pegg argues on appeal that he was in custody for purposes of *Miranda* because the government deceived him about the purpose of the interview, his attorney was only concerned for her own self-interests during the interview, and the government deceived him concerning the FBI agent's identity. [4] We find no error.

We apply a mixed standard of review to a district court's denial of a motion to suppress, reviewing the factual findings for clear error and the legal

---

[4] Pegg also argued that the statements he made during the interview should be suppressed because the interview was a "perjury trap," but he abandoned this argument on appeal.

determinations *de novo. United States v. McCullough*, 851 F.3d 1194, 1199 (11th Cir. 2017). We construe the facts in light most favorable to the United States as the prevailing party. *Id.*

Statements made during a custodial interrogation are not admissible at trial unless the defendant was first advised of his rights. *Miranda*, 384 U.S. at 444-45, 86 S.Ct. at 1612. The term "custody," as used in *Miranda* case law, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). Whether a suspect is "in custody" for purposes of *Miranda* depends on the circumstances surrounding the interrogation and whether the "restraint on freedom of movement [is] of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (citations and quotations omitted). This determination depends on the objective circumstances of the interrogation, not the subjective views of either the interrogating officers or the person being questioned. *Id.* at 323, 114 S.Ct. at 1529; *see Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

The fact that a prisoner is questioned while serving "a term of imprisonment, without more, is not enough to create *Miranda* custody." *Howes*, 565 U.S. at 512, 132 S.Ct. at 1191. First, interrogating an incarcerated person in prison is

7

interrogating him in his home, and thus does not involve "the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Id.* at 511, 132 S.Ct. at 1191 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 103, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010)). Second, when a prisoner is questioned, he is unlikely to be "lured into speaking by a longing for prompt release." *Id.* Finally, a prisoner, unlike a person who has not been convicted and sentenced, knows that the interrogating officers "probably also lack the power to bring about an early release." *Id.* at 512, 132 S.Ct. at 1191.

Pegg argues he was in custody because he was lured into speaking by a "longing for prompt release," and he knew that the AUSAs conducting the interview could file a Rule 35 motion for him, thereby reducing the duration of his sentence. Pegg's "longing for a prompt release" and anticipation for a potential sentence reduction, however, were merely his subjective views surrounding the interview, not the objective circumstances of the interview itself. Viewed objectively, a reasonable person in Pegg's circumstances would have understood that the AUSAs conducting the interview lacked the authority to release him from prison early because even if the AUSAs filed a Rule 35 motion, the district court retained the discretion to deny the motion.

No evidence shows that Pegg was coerced or pressured to make any statement

during the two-hour interview. On the contrary, Pegg and his attorney agreed to the interview in advance and gave permission to the AUSAs to record the interview. Pegg's attorney was present and available to Pegg throughout the interview, and he even consulted with his attorney in private. Pegg was not physically restrained during the interview; for example, he could get a drink. During the interview, the AUSAs made statements suggesting that the government had evidence that Pegg and his family had paid Morales and indicating that Pegg and his family members could be prosecuted if they gave false statements about the payments. But even considering these statements, we cannot say that Pegg was intimidated, bullied, or physically threatened. Pegg was not "in custody" for purposes of *Miranda*, and therefore, no *Miranda* warning was required.

We find no merit in Pegg's contentions that the interview was custodial because his attorney failed to act in his best interests or because the AUSAs deceived him by concealing the FBI agent's identity. First, Pegg fails to demonstrate how his attorney's interests and his own did not align—his attorney's fee was contingent on her success in helping Pegg reduce his sentence. More importantly, Pegg fails to show how a conflict of interest, if any, or the presence of the FBI agent changed the objective, non-custodial circumstances of his interview.

9

### b. Motions for Mistrial

Throughout the trial, Pegg made several motions for mistrial based on the government's alleged prosecutorial misconduct. Specifically, Pegg objected to (1) the government's references to the guilt of defendants connected to his case; (2) the government's statements throughout trial that Pegg's payments to the third-party cooperator were "illegal"; and (3) the government's closing argument asking the jury to put themselves in the shoes of a defendant. The district court denied each motion, finding that the government's statements did not rise to the level of prosecutorial misconduct, and Pegg had not been prejudiced by them. In addition, the district court gave certain limiting instructions to the jury to cure any improprieties. We find no error.

We review a district court's denial of a motion for mistrial for abuse of discretion. *United States v. Garcia*, 405 F.3d 1260, 1272 (11th Cir. 2005). We review *de novo* the question of prosecutorial misconduct. *United State v. Schmitz*, 634 F.3d 1247, 1266-67 (11th Cir. 2011). "Reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Woods*, 684 F.3d 1045, 1065 (11th Cir. 2012) (quoting *United States v. Crutchfield*, 26 F.3d 1098, 1099 (11th Cir. 1994)). "Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights." *United*

*States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998) (internal quotation omitted). To determine the prejudicial impact of the prosecutor's statements, we "must evaluate them in the context of the trial as a whole and assess their probable impact on the jury." *Id.* A defendant's substantial rights are only prejudicially affected "when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

None of the government's remarks, taken separately or cumulatively, prejudicially affected Pegg's substantial rights. First, the district court gave multiple instructions to the jury to cure any of the government's improper remarks. The court cured any improper reference to other individuals involved in Pegg's scheme pleading guilty, by instructing the jury that a witness's guilty plea cannot serve as evidence of the guilt of a defendant. Likewise, the court cured any improper references to third-party cooperator payments as "illegal," by reminding the jury that the court would give the law necessary to prove the counts alleged at the close of the trial. Second, even assuming that the government's argument asking the jury to put themselves in the position of the defendant, as opposed to the victim, was improper, it did not rise to the level requiring a mistrial. The government's remarks did not affect the outcome of the trial, and the government presented overwhelming evidence of Pegg's guilt. "When the record contains sufficient independent evidence

11

of guilt," any error arising from the government's improper closing argument "is harmless." *Id.*; *see United States v. Adams*, 74 F.3d 1093, 1097-98 (11th Cir. 1996). Therefore, the district court did not abuse its discretion by denying Pegg's motions for mistrial.

### c. Jury Instructions

Pegg contends the district court's rejection of three of his proposed jury instructions deprived him of a fair trial. Pegg requested instructions to inform the jury that (1) a violation of a USAO third-party cooperation policy did not constitute a violation of the law; (2) no federal law prohibited the payment of monies to third-party cooperators; and (3) no law prevented the USAO from prosecuting a case in which a third-party cooperator was paid. The district court found the requested jury instructions were confusing and improper because they were arguments for Pegg's defense, not statements of the law. We agree.

We review a district court's refusal to give a particular jury instruction for abuse of discretion. *United States v. Chahla*, 752 F.3d 939, 948 (11th Cir. 2014). A district court abuses its discretion in denying a requested jury instruction if: (1) the instruction is correct; (2) the instruction was not substantially covered by the given charge; and (3) the defendant's ability to present an effective defense was seriously impaired by the failure to give the instruction. *United States v. Sirang*, 70 F.3d 588, 593 (11th Cir. 1995). "The district court has broad discretion in formulating jury

12

instructions as long as those instructions are a correct statement of the law." *United States v. Garcia*, 405 F.3d 1260, 1273 (11th Cir. 2005); *see United States v. Sanfilippo*, 581 F.2d 1152, 1154 (5th Cir. 1978) (holding that no reversible error exists if the district court's original and supplemental instructions accurately present the substantive law). We review *de novo* whether the content of instructions that were given are correct statements of law. *United States v. Chandler*, 996 F.2d 1073, 1085 (11th Cir. 2011).

First, we find no abuse of discretion because the district court's jury charges substantially covered Pegg's requested instructions and accurately presented and explained the substantive law to the jury. Second, the district court's rejection of Pegg's proposed instructions did not prevent Pegg from arguing his defense to the jury that his payments to the third-party cooperator were not illegal, and thus the USAO could have prosecuted the case against Murais. Finally, the requested jury instructions were not needed to cure any misstatements of the law during trial. As discussed earlier, the district court gave curative instructions as needed throughout trial. The district court's refusal to give Pegg's requested jury instructions did not leave "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997) (internal quotation omitted). Thus, we find no error in the district court's refusal to include Pegg's jury instructions.

13

### d. Motion for Judgment of Acquittal

Pegg next appeals the district court's denial of his motion for judgment of acquittal on the conspiracy to obstruct justice and the substantive obstruction of justice charges, arguing insufficient evidence exists to support his convictions.[5] An appellate court reviews *de novo* the denial of a motion for judgment of acquittal on sufficiency of the evidence, looking at the evidence "in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor." *United States v. Friske*, 640 F.3d 1288, 1290-91 (11th Cir. 2011) (internal quotation omitted). We must decide whether any reasonable view of the evidence is sufficient to allow a jury to find guilt beyond a reasonable doubt. *United States v. Leonard*, 138 F.3d 906, 908 (11th Cir. 1998). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

The obstruction provision under 18 U.S.C. § 1503 prohibits persons from "endeavor[ing] to influence, obstruct, or impede[] the due administration of justice." 18 U.S.C. § 1503. *See United States v. Aguilar*, 515 U.S. 593, 598, 115 S.Ct. 2357, 2361, 132 L.Ed.2d 520 (1995). To sustain a conviction under § 1503, the government

---

[5] Pegg also moved for judgment of acquittal on count three, arguing that his false statement was not "material," but he abandoned that argument on appeal.

must show the defendant's endeavor had the "natural and probable effect of interfering with the due administration of justice*.*" *Id.* at 601, 115 S.Ct. at 2363 (citations and quotations omitted).

The testimony presented at trial was sufficient to establish that Pegg and Morales had an agreement whereby Pegg would pay Morales for his third-party cooperation and the payments would be concealed from the government. The evidence sufficiently allowed the jury to find that that Pegg's actions had the natural and probable effect of interfering with Pegg's anticipated Rule 35 proceeding beyond a reasonable doubt.

To sustain a conviction under § 1503, the government must also show the defendant endeavored to obstruct justice with the intent to affect a judicial proceeding. *Aguilar,* 515 U.S. at 599, 115 S.Ct. at 2362. The Supreme Court has held that "the act must have a relationship in time, causation, or logic with the judicial proceedings." *Id.* The government, however, "need not always show that a judicial proceeding existed at the time the defendants formed the conspiracy." *United States v. Vaghela*, 169 F.3d 729, 734 (11th Cir. 1999). But the government must "demonstrate that the actions the conspirators agreed to take were directly intended to prevent or otherwise obstruct the processes of a specific judicial proceeding in a way that is more than merely 'speculative.'" *Id.* at 734-35.

15

Pegg argues that there is no link between any judicial proceeding and his scheme. To obtain a reduction of Pegg's sentence through Rule 35, however, the government had to file a Rule 35 motion on his behalf and present that motion to the district court for a decision. The government presented sufficient evidence that Pegg intended to affect a judicial proceeding because his actions had a "relationship in time, causation, or logic" to his Rule 35 motion and the subsequent ruling by the district court. Furthermore, we have held in a different context that the filing of a Rule 35(b)(2) motion is a separate judicial proceeding in a criminal case. *United States v. Moreno*, 364 F.3d 1232, 1235 (11th Cir. 2004). Thus, the district court did not err in denying Pegg's motions for judgment of acquittal.

### e. Sentencing Enhancements

Finally, Pegg challenges his three-level sentencing enhancement for substantially interfering with the administration of justice and his two-level sentencing enhancement for participating in a crime otherwise extensive in scope, planning, or preparation. We review the district court's application of the Federal Sentencing Guidelines *de novo* and findings of fact for clear error. *United States v. Newman*, 614 F.3d 1232, 1235 (11th Cir. 2010). "For a factual finding to be 'clearly erroneous,' this court, 'after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed.'" *United States v.*

16

*Rodriguez–Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004) (quoting *United States v. Foster*, 155 F.3d 1329, 1331 (11th Cir. 1998)).

### i. Substantial Interference with the Administration of Justice

"Substantial interference with the administration of justice" includes a "premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2), cmt. n.1. The definition of "substantial interference with the administration of justice" in the Guidelines is not exhaustive. *Newman*, 614 F.3d at 1236.

The district court properly applied the sentencing enhancement because Pegg's actions prevented the government from prosecuting Murais. Pegg's scheme caused the government to rely on Morales, who ultimately spoiled the investigation and prosecution of Murais. Furthermore, the commentary in Guidelines § 2J1.2 explains that a "substantial interference with the administration of justice" includes "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2), cmt. n.1.; *see United States v. Johnson*, 485 F.3d 1264, 1271-72 (11th Cir. 2007) (sentencing enhancement was warranted where, as a result of the defendant's false grand jury testimony, the government was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the

17

grand jury). Pegg's scheme and lies caused a substantial waste of resources, including hundreds of hours of work from the investigators. We find no error.

### ii. Extensive in Scope or Planning

We also find no error in the district court's application of a two-level sentence enhancement for a crime "otherwise extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3)(C). "Although this circuit does not employ a precise definition for the 'otherwise extensive' standard, there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved." *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994).

Pegg's crime was "otherwise extensive in scope, planning, or preparation" because his scheme involved an elaborate gathering together of lies and misrepresentations. The evidence introduced at trial showed that Pegg coordinated the scheme in secret from prison, directing several people through numerous coded phone calls and e-mails. Pegg established a "cover-up" story that Morales's payments were for roofing or other expenses to further conceal the payments from investigators. Off and on for at least four years, Pegg and his associates were involved in planning and preparing for a Rule 35 motion. The record supports the district court's finding that Pegg's offense was "extensive in scope and planning," and therefore, the district court's application of the sentencing enhancement was

18

warranted.

## III.   CONCLUSION

We **AFFIRM** the district court on all issues on appeal. We also have pending before the court a motion from Pegg that the panel issue a non-published opinion to resolve this appeal. We deny the motion as **MOOT**.